UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

UNITED STATES OF AMERICA     PLAINTIFF

v.     No. 5:24-cr-40-BJB

ANTONIO D. JACKSON ET AL.     DEFENDANTS

\* \* \* \* \*

OPINION REGARDING THE DENIAL OF JACKSON'S MOTIONS TO SUPPRESS

Officers with the McCracken County "Special Response Team" pulled over a Kia Optima driven by Antonio Jackson in Graves County on April 16, 2024. They searched the car and found 116 grams of crystal methamphetamine and $1,000 in premarked (or "precopied," *see* DN 54-3) buy money. Facing federal methamphetamine-trafficking charges and a December 2025 trial date, earlier this year Jackson filed three motions to suppress evidence. His principal theory, which evolved across these motions and his post-hearing brief, is that suppression is necessary thanks to a cascade of unlawful government conduct: first, reliance on a less-than-credible confidential informant, which led to a dubious warrant for a tracking device on his girlfriend's car, which then led to a search warrant for the car and another girlfriend's house, and ultimately to the search and arrest of Jackson himself.

This sequence, Jackson maintains, requires suppression of "all evidence obtained by use of a vehicle tracking device authorized by a warrant." Third Motion (DN 52) at 1. But the current record—developed after supplemental Government disclosures and an evidentiary hearing—doesn't support Jackson's version of events. And even if everything he alleges were true, the law still wouldn't require suppression. Because probable cause supported the steps taken by law enforcement as they continued this investigation—and because the record offers no reason to doubt their good faith regardless—suppression isn't justified here. Nor have the Government's omissions or delays in disclosures prejudiced Jackson in a manner supporting the extreme remedy of suppression. As a result, the Court denied each of his three motions during the final pretrial conference. DN 69. This opinion memorializes and clarifies the reasons for the denials offered on the record during that hearing.

### A. The Record

As discussed during the hearing and reflected in the limited record presented at this stage, the investigation of Antonio Jackson involved three warrants relevant to these motions.

**1.** The first warrant authorized a tracking device on a yellow 2017 Dodge Charger registered to Cheiquita Jones,[1] a girlfriend of Jackson. First Warrant (DN 54-1) at 2; Hearing Transcript (DN 58) at 14:2. The affidavit supporting the warrant, submitted by Detective Blake Maness of the McCracken County Sheriff's Office, explains that a confidential informant, whose identity was known to law enforcement, admitted to purchasing drugs from Jackson. That informant also told two DEA special agents that Jackson drove a Charger, which law enforcement connected to Jones. *See* First Warrant at 6. The information gleaned as a result of this warrant informed law enforcement's continued investigation, but none of Jackson's three suppression motions bear directly on its issuance by the magistrate or its execution by law enforcement. *See* Hearing Transcript at 4.

**2.** A second vehicle-tracking warrant followed the interception of a package of methamphetamine by the Department of Homeland Security. The package was addressed to Amber Parrott, another girlfriend of Jackson. Second Warrant (DN 54-2) at 7; Hearing Transcript at 12:12–14. According to McCracken County Detective David Clark, that interception caused Jackson to switch cars in hopes of avoiding detection. Second Warrant at 8; *see* Hearing Tr. at 14:8–9. But officers soon saw Jackson driving a black 2020 Kia Optima (also owned by Cheiquita Jones); Jones apparently swapped with Jackson and started driving the Charger. Second Warrant at 7–8.

So Detective Maness sought and obtained an additional warrant to track the Kia. *Id.* at 11. The supporting affidavit (like the one submitted in support of the first warrant application) detailed the same CI tips; it also relied on the intercepted drug package, subsequent car switch, the common ownership of the Charger and the Kia, and the Kia's location parked outside Jackson's house. *Id.* at 6–8.

**3.** Then another tip from a confidential informant—along with additional information gathered during the investigation—led to a third warrant.[2] This tipster

---

[1] Two spellings of this name appear in the record: "Chequita," DN 54-4 at 8, and "Cheiquita," *id.* at 7. Both appear to refer to the same woman.

[2] The record does not make clear whether this was the same informant cited in the first and second warrant applications or a new one. The third affidavit does, however, appear to mention separate CIs and suggests a different trafficking relationship between this CI and Jackson—holding drugs for Jackson (at least initially) rather than sourcing them from him

2

reported that Jackson used Ivy Daniels (a co-defendant in this case) to distribute drugs as a middleman. Hearing Transcript at 16:1–4. In response, officers arranged for the CI to conduct another controlled buy, using premarked buy money and recorded with a hidden camera. *Id.* at 16:5–8. On April 14, the tracking device captured that vehicle leaving Parrott's house at the time of the coordinated buy. *Id.* at 27:17–28:14. The confidential informant drove Daniels to the designated parking lot. Then Daniels left the informant's car and entered the Kia. *Id.* at 30:1–3. Law enforcement, surveilling these events, watched Daniels return to the informant's car with a new "pooch" in his sweatshirt pocket. Hearing Transcript at 30:2. The officers presumed that the pooch contained drugs delivered in the Kia from Parrott's house. *Id.* at 16:22–25; *see* Third Warrant (DN 54-4) at 15–16.[3]

Based largely on that buy, the next day Detective David Clark (who testified at the hearing) obtained another warrant—this one authorizing the search of Jackson, the Kia Optima, and Parrott's house. The supporting affidavit echoed the first and second in citing the tipster's interview, the Parrott-package interception, and the Charger/Optima switch; it also added details regarding the April 14 controlled buy. *Id.* The next day, before executing this third warrant, law enforcement arranged another controlled buy. Investigation Report (DN 54-3) at 4. Jackson drove the Kia from Parrott's residence to Daniels's apartment, where he met the informant and completed the second controlled buy. *Id.*

Then the McCracken County Special Response Team decided to stop Jackson, consistent with the search warrant. They stop him, but Jackson tried to flee and his Kia ultimately hit the Special Response Team's vehicle. *Id.* at 5. Approaching the car, law enforcement allegedly noticed about 116 grams of methamphetamine on Jackson's lap. *Id.* Officers searched him and the Kia—as the warrant authorized—before arresting him. *Id.* Law enforcement then executed the search warrant at Parrott's house and found $2,540 in premarked cash that the informant had used for the April 14 buy. *Id.*

---

in large quantities. *Compare* Third Warrant at 4–5, *with id.* at 7–8 & Second Warrant at 5–6. Regardless, the affidavit indicates that police knew this informant's identity. *See* Third Warrant at 15–17.

[3] To the extent Jackson argues the jury shouldn't see video of this buy, based on doubts about Jackson's discernibility and identity in the picture, that objection is one better raised at trial on evidentiary rather than constitutional grounds. *See* Supp. Br. 5 ("This suppression request includes the video of Ivy Daniels getting in the Kia in the parking lot of McDonald's. There is no one who has testified that the driver of the vehicle was Antonio Jackson. No one saw him. The windows were tinted and no one could see inside the vehicle.").

3

A grand jury subsequently charged Jackson with four counts (and Daniels with three) of methamphetamine trafficking. Superseding Indictment (DN 38).

### B. Motions to Suppress

#### 1. First Motion to Suppress

Jackson's first suppression motion resulted from a discovery mishap on the part of the Government. Believing the Government searched and arrested him without a warrant, Jackson moved to suppress "any and all evidence obtained by law enforcement as a result of the traffic stop involving Antonio Jackson." First Motion to Suppress (DN 34) at 1. The Special Response Team officers who pulled him over, he maintained, lacked probable cause to do so. To the extent the officers relied on tips from a confidential informant (whose identity Jackson nevertheless says he knows), that tipster was unreliable and uncorroborated. *Id.* at 8–11. The motion also complained of the vehicle-tracking warrant placed on the Charger driven by Jackson but registered to a girlfriend. *Id.* at 11.

This motion alerted the Government to its failure to disclose the search warrant (the second of the two listed above) that had authorized the Kia tracking device. The Government then disclosed the warrant, First Response (DN 54), the Court continued the previously scheduled evidentiary hearing, DN 48, and the parties agreed that Jackson could supplement his motion to challenge the Charger warrant as well.

To the extent the First Motion challenged the warrantless nature of the April 16 stop or the probable cause that otherwise might've justified it, the existence of the warrant defeats those objections—and no party contends otherwise. To the extent Jackson complains about reliance on the CI, that argument was further developed at the hearing and in subsequent filings—and is therefore addressed below. Nothing in the initial motion, therefore, independently justifies suppression. So the Court denied it during the rescheduled evidentiary hearing—without prejudice to Jackson's ability to raise the same or similar issues in his subsequent motions.

#### 2. Second Motion to Suppress

Consistent with the parties' agreement, Jackson "supplemented" his motion to suppress—at least in a manner of speaking. He did so (in part) by filing a freestanding second motion, based not on the Fourth Amendment but on violations of the Court's discovery order, Federal Rule of Criminal Procedure 16, and the Fifth Amendment's Due Process Clause. Second Motion to Suppress (DN 51) at 1. After receiving the search warrant that the Government previously failed to disclose, Jackson asked the Court to suppress the evidence that was not timely disclosed—presumably the warrant itself, though the sparse motion doesn't specify. According

to Jackson, the unjustified disclosure-deadline violation caused Jackson to "suffe[r] prejudice by investigating this action based upon the evidence presented by the government," prejudice that he maintains leaves "suppression [as] the only effective remedy." Second Motion at 3.

This motion fails for lack of prejudice. Although the Government indeed erred in not disclosing the warrant sooner, nothing suggests any bad faith or anything beyond an innocent mistake. The Government ultimately recognized the error and supplied the missing warrant in time for Jackson to make use of this information well before trial and file another suppression motion. The Court, in turn, received full briefing, argument, and evidentiary presentation at and after its rescheduled suppression hearing—all well in advance of trial.

The delay didn't cause Jackson any identifiable (much less uncurable) prejudice—and certainly not enough to justify suppression of the evidence obtained as a result of that warrant. *See* FED. R. CRIM. P. 16(d)(2). Whether suppression is an appropriate remedy for a discovery violation, the Sixth Circuit has explained, turns on "the reasons for the government's delay," "the degree of prejudice, if any, to the defendant," and "whether the prejudice to the defendant can be cured with a less severe course of action, such as granting a continuance or a recess." *United States v. Maples*, 60 F.3d 244, 247 (6th Cir. 1995). The suppression remedy, moreover, is considered "undesirable," and "reserved for cases of incurable prejudice or bad faith conduct demanding punishment by the court." *Id.*

The Sixth Circuit rejected suppression based on a discovery delay in *Maples*—and did so for reasons that reflect why suppression is likewise inappropriate here. In *Maples*, a district judge suppressed evidence based on the prosecution's one-month delay in disclosing an inculpatory statement. The "waste of time on early trial strategies and possible disadvantages at sentencing" that the Defendant complained of were "far too intangible and speculative" to "conclude that any meaningful prejudices had resulted from the delay." *Id.* at 247. So too here. The only potential effect Jackson identifies is a very general one: "that he suffered prejudice by investigating this action based upon the evidence presented by the government." Second Motion to Suppress at 3. Such abstract disadvantage is precisely the sort of purported prejudice that the *Maples* court discounted. And other district courts have reached the same conclusion. *See, e.g., United States v. Wombold*, No. 3:16-cr-20, 2017 WL 11435719, at *3 (E.D. Tenn. Dec. 29, 2017) ("[T]he Government's reasons for its late designations and productions, including its lack of bad faith or intentionality, combined with the lack of specific prejudice to Defendants, do not warrant suppression of the evidence Defendants identify.").

5

Here, the Government disclosed the second tracking warrant six months after its discovery deadline, but two months before the deadline for pretrial motions. Despite the delay, Jackson had ample opportunity to respond to the warrant in preparation for trial and motions practice. That much is clear from his filing of this motion and the additional one discussed below. *See* DNs 51 & 52. Further, he was able to present his arguments at a hearing, *see* DN 58, cross-examine the prosecution's witness, and submit a supplemental motion following that hearing, *see* DN 64. So it's hard to see how the delay might've impeded his defense. And nothing about the delay suggests the Government acted in "bad faith." *Maples*, 60 F.3d at 247. Given the limited nature of the violation and absence of meaningful prejudice, the Court denied this second motion to suppress at the hearing.

### 3. Third Motion to Suppress

As previewed above, Jackson also filed a third suppression motion covering "all evidence obtained by use of a vehicle tracking device" issued by a state-court judge. Third Motion to Suppress (DN 52) at 1. That warrant, Jackson maintains, "was based on an affidavit" from Detective Blake Maness "that was materially insufficient, misleading, and conclusory"—including no factual details connecting Jackson to the Kia or drug trafficking. *Id.* All the evidence gleaned from the tracker, as well as the investigatory fruits of that search—up to and including Jackson's own arrest—is in his view subject to suppression.

The Government's response, however, notes that Jackson's motion doesn't challenge the separate warrant used to *search* (not track) the Kia when he was arrested. Response (DN 54) at 1. That warrant appears to authorize the search (and subsequent arrest) of Jackson independent of the validity of earlier searches based on the tracking warrant. Although the third warrant application certainly relied on some evidence gleaned from the tracker, its support wasn't limited to that information. Given the lack of a direct challenge to the operative warrant that authorized the April 16 stop, the challenge to the prior tracking warrant is likely immaterial to the ultimate justification for the search. And, as discussed below in connection with Jackson's "supplemental" filing, officers had good reason to stop the Kia regardless. *See* below at § C. Nevertheless, to clarify Jackson's arguments and hear the Government's evidence of its good faith, the Court held a suppression hearing, where Detective David Clark of the McCracken County Sheriff's Office testified about the investigation of Jackson and the relevant searches. Suppression Hearing (DN 58) at 3:17–20; 11:4–6.[4]

---

[4] Given that valid warrants supported the searches of the Kia and Jackson himself, the question whether Jackson lacks standing to challenge the search of his girlfriend's car is

The tracking warrant, even assuming it could undermine the separate warrants that followed, passes constitutional muster. The state-court judge who issued the warrant "had a substantial basis for concluding" that probable cause supported the warrant to install the Kia tracking device. *Illinois v. Gates*¸ 462 U.S. 213, 238–39 (1983) (cleaned up).

First, the affidavit recounted that a named CI, after his arrest with two pounds of methamphetamine, said he bought the drugs in Mayfield from "Antonio." Second Warrant at 6. He normally bought 2–4 pounds from Jackson every 2–3 weeks. *Id.* at 6. Other known and anonymous tips also relayed that Jackson was selling large quantities of methamphetamine in the area. *Id.* at 5.

Second, the CI said that Jackson (at that time) drove a yellow and black Dodge Charger. *Id.* at 5–7.

Third, the CI described Jackson's physical appearance (most notably his grill-plated teeth) and his residence in Murray, both of which police confirmed. *Id.* at 6, 7. They also learned that Jackson had numerous prior convictions for trafficking. *Id.* at 6.

Fourth, vehicle records revealed Jackson had been pulled over while driving the Charger. *Id.* at 7. Law enforcement also had recently spotted Jackson driving the Charger. *Id.*

Fifth, Task Force members with DHS had intercepted a large package of methamphetamine addressed to Autumn Parrott, Jackson's girlfriend. *Id.*

Sixth, after that interception Jackson and Jones had swapped vehicles. *Id.* Law enforcement officers saw him driving the Kia instead of the Charger. Both vehicles were registered to Jones. In the experience of Detective Maness, "those involved in illegal activity will often switch vehicles that they are operating in order

---

unnecessary to resolve. *See United States v. Russell*, 26 F.4th 371, 374 (6th Cir. 2022) ("Fourth Amendment standing is a merits question, not a jurisdictional one."). In any event, the Government's position—that Jackson lacks a "legitimate expectation of privacy" allowing him to complain about the car search—sits in considerable tension with its argument that he was sufficiently connected to the car to justify a warrant (or establish probable cause for the traffic stop in any event). *See* Response at 4, 8 (citing *United States v. Pino*, 855 F.2d 357, 360 (6th Cir. 1988)); Hearing Tr. at 13:24–14:24. The stronger the connection between Jackson, drug-trafficking evidence, and the Kia, in other words, the weaker the argument that Jackson lacked a reasonable expectation of privacy in that vehicle. *Cf. United States v. Smith*, 263 F.3d, 571, 586–87 (6th Cir. 2001) (addressing expectations of privacy in a rental car).

to avoid detection by Law Enforcement especially if they believe that their criminal activities have been." *Id.* at 8.

All of this justifies the state-court judge's probable-cause finding that Jackson drove the Kia in connection with a drug-trafficking scheme, such that continuous monitoring of its movements through the vehicle-tracking device would likely reveal evidence of Jackson's criminal activity. The corroborated informant, common ownership of the vehicles, package interception, surveillance, and the affiant's knowledge and expertise comfortably established a "substantial basis" for the magistrate's probable-cause finding and issuance of the tracking warrant for the Kia. *Gates*, 462 U.S. at 239.

Jackson's counterarguments lack merit.

He contends the affidavit omitted key facts about the CI's credibility—namely his history of trafficking methamphetamine. Third Suppression Motion at 7. This is nonsense. The affidavit recounts that the CI was interrogated after his arrest for possessing two pounds of drugs and a gun. The risks and rewards of cooperating with or lying to law enforcement in that compromised situation are too obvious to explain here and were undoubtedly understood by the magistrate. Moreover, the CI also volunteered additional incriminating information (his history of repeated and large drug transactions) about *himself* as well as Jackson. The named informant, after all, "could potentially be held accountable for providing false information." *United States v. Couch*, 367 F.3d 557, 560–61 (6th Cir. 2004). And the affidavit went on to offer additional information regarding Jackson—his teeth, his car, his address, his trade—that law enforcement used to corroborate the informant's "veracity," "reliability," and "basis of knowledge." *Gates*, 462 U.S. at 230.

The identity of the informant, moreover, was known to law enforcement, giving his report "greater reliability" and rendering it "more supportive of a finding of probable cause." *United States v. May*, 399 F.3d 817, 823 (6th Cir. 2005).

Jackson also points to the informant's "ongoing drug use," which Jackson says could have "impaired" the informant's reliability. Second Suppression Motion at 3. Again, the affidavit made clear that the confidential informant admitted to criminal conduct that could've affected his sobriety—that is, purchasing methamphetamine from Jackson. Second Warrant at 5. None of this should've been lost on a magistrate reading the affidavit. Jackson's motion identified no actual false statements made by the affiant. *See* Third Suppression Motion at 3. Nor did he identify any specific misstatements at the hearing.

Third, Jackson characterizes the affidavit as "bare bones"—one on which an officer couldn't rely in good faith. *United States v. Leon*, 468 U.S. 897, 915 (1984);

8

Third Motion to Suppress at 3.  But as discussed above, the affidavit neither "nakedly assume[d]" nor "vaguely conclude[d]" the existence of probable cause.  *United States v. Sanders*, 106 F.4th 455, 468 (6th Cir. 2024) (en banc).  Rather, it described the confidential informant's tips, law enforcement's corroboration of those tips, common ownership of the Kia Optima and Charger, a recently intercepted packages of drugs addressed to Jackson's girlfriend's home, and the affiant's experience of assessing drug-trafficking tactics that often involve switching vehicles to evade detection.  So even assuming these details didn't rise to probable cause (which they plainly did), the affidavit would at least "creat[e] disagreement among thoughtful and competent judges as to the existence of probable cause." *Leon*, 468 U.S. at 926.  That's enough for law enforcement to rely on the warrant, making the "application of the extreme sanction of exclusion … inappropriate."  *Id.*  Nothing in the record indicates the officers acted in bad faith or otherwise unreasonably in obtaining or relying on this tracking warrant.

So Jackson's third motion to suppress failed because it doesn't undermine the magistrate's reliance on the corroborated CI report, or the officers' good-faith reliance on that duly-issued warrant, or the independent lawfulness of the later warrant that justified the April 16 stop and arrest.

### C. Supplemental "Response" to Previously Filed Motion to Suppress

Following the Court's suppression hearing, Jackson filed a supplemental brief, styled as a "response," which reprises his tracking-warrant and confidential-informant objections rejected above.  Jackson Supplemental Br. (DN 64) at 1.  The filing also contended that law enforcement lacked a legal basis to pull over the car he was driving on April 16.  This stop, in his view, flowed from the challenged Kia tracking warrant: "Had it not been for the tracker device, [law enforcement] would not have had the connection between Antonio Jackson and Ivy Daniels"—and (at least implicitly) wouldn't have had the third search warrant.  Supplemental Response at 9.

That is wrong.  First, and most fundamentally, the tracking warrant was valid and validly relied on—as discussed above in § B.3.  So reliance on information gleaned from the tracker doesn't contaminate the third warrant application.  And if the third search warrant is valid, the Task Force obviously had lawful authority to pull over and search the Kia on April 16.

Second, Jackson has again not seriously argued that the officers acted in bad faith in relying on the information derived from the tracker.  So *Leon*'s good-faith exception would prevent suppression regardless.  *See United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2005) ("[E]vidence seized pursuant to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule

9

if an objectively reasonable officer could have believed the seizure valid.") (citation omitted). And in addition to the tracking-related information, the third warrant affidavit also relied on information obtained separately from the controlled buy, Parrott package interception, and additional tips from a confidential warrant.

Third, Jackson contends that "no traffic violation" justified the stop. *Id.* at 8. But that's irrelevant: the Government never sought to justify the stop on the basis of a pretextual stop. Rather, they pointed to the validity of the warrant and—as discussed below—their independent suspicion of criminal evidence in the Kia following the second controlled buy.

By the time the arresting officers pulled over Jackson on April 16, they plainly had at least reasonable suspicion to conduct a traffic stop. Officers had just seen Jackson leave his residence in the Kia, travel to Daniels's house (where the informant waited for the planned exchange), and then drive back to Parrott's residence in Mayfield. Jackson had just left his residence in the Kia, traveled to Daniels's house (where the informant waited for the planned exchange), and then drove back to Parrott's residence in Mayfield. They had surveilled Jackson "the entire time" Hearing Transcript at 18:18–19. Irrespective of anything gleaned from the tracking device, therefore, the police had at least a "reasonable suspicion to believe that criminal activity"—namely drug trafficking—"may be afoot," which is all they needed to conduct a brief "investigatory stop." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (cleaned up). And upon conducting this stop, they discovered 116 grams of methamphetamine in his lap—in plain view—which was more than enough reason to seize the evidence (and make an arrest) based on probable cause. *See, e.g.*, *United States v. Baker*, 976 F.3d 636, 646–48 (6th Cir. 2020); *United States v. Bentley*, 29 F.3d 1073, 1075–76 (6th Cir. 1994).

So between the warrant, the good-faith exception, and the independent reasonable suspicion, officers had at least three sufficient reasons to stop Jackson on April 16. To the extent the supplemental filing raises new reasons for suppression beyond the three prior motions, those fail to justify the relief Jackson seeks—and the Court's denial of that request during the pretrial conference stands.

Jackson makes one final argument: that the Task Force's violated a Kentucky Department of Corrections policy that limits the use of probationers and parolees as confidential informants. Jackson's Supplemental Motion at 6–8. Under this state policy, an "appropriate authority" must approve the use of such a person as an informant. *See* Kentucky Department of Corrections Policy No. 27-07-01. Even accepting that's true, Jackson cites no authority (and the Court's not aware of any) that mandates suppression for such procedural shortfalls under state administrative rules. The Supreme Court has never held that "violations of state arrest law are also

10

violations of the Fourth Amendment." *Virginia v. Moore*, 553 U.S. 164, 173 (2008). As the Sixth Circuit has made clear, "The fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended. This is so because the exclusionary rule is only concerned with deterring Constitutional violations." *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994). Although Jackson also cites a federal guideline containing a similar requirement for judicial approval for the use of federal probationers, Supplemental Motion at 7 (citing Chapter 2 of a federal guidebook on federal post-conviction supervision), Jackson again fails to explain how any such violation would apply here or justify suppression—much less both. And the Supreme Court, time and again, has made clear that even violations of federal constitutional norms do not require suppression absent bad faith. *See Leon*, 468 U.S. at 915. The use of a felon as a confidential informant does not, without more and despite Jackson's suggestion, "shock the conscience" in violation of the Fourteenth Amendment. *Compare* Supp. Br. 7, with *Rochin v. California*, 342 U.S. 165 (1952) (forcibly pumping stomach to induce vomiting of pill shocks the conscience).

## CONCLUSION

As discussed during the final pretrial conference and elaborated in this opinion, Jackson's motions to suppress (DNs 34, 51, & 52) all fail.