UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

UNITED STATES OF AMERICA

v.                                                         No. 5:24-cr-40-BJB

ANTONIO D. JACKSON

\* \* \* \* \*

## OPINION AND ORDER EXPLAINING DENIAL OF MOTIONS TO SUBSTITUTE COUNSEL, DELAY TRIAL & WITHDRAW GUILTY PLEA

A grand jury indicted Antonio Jackson in 2024 for four methamphetamine-trafficking offenses. Extensive pretrial practice followed: three motions to suppress, motions to "remand" and "transfer" Jackson's pretrial confinement, a superseding indictment, a final pretrial conference with codefendant Ivy Daniels, a day-of-trial continuance due to defense counsel's illness, Daniels's guilty plea, and finally a second trial date of April 20, 2026.

Minutes before jury selection on the 20th, however, Jackson tried to fire his lawyer, Richard Walter. Defense counsel moved to withdraw on the ground that he had lost Jackson's "faith and trust," causing a breakdown in the attorney-client relationship. Jackson considered his lawyer's trial preparation insufficient because Jackson himself didn't have enough time to inspect the Government's exhibit and witness lists. But that temporizing objection didn't withstand scrutiny: neither Jackson nor defense counsel identified any motion or change in strategy that additional preparation time would've yielded. Nor did they identify a conflict or any other insurmountable obstacle in the relationship, even after being afforded an immediate *ex parte* hearing in front of the Magistrate Judge to explore any latent issue outside the presence of the presiding judge and opposing counsel.

Disagreement over trial preparation—here, just the total time spent, not any strategic choices—doesn't suggest a "total lack of communication" between the attorney and his client. *United States v. Marrero*, 651 F.3d 453, 466 (6th Cir. 2011). Moreover, Jackson, of his own volition, retained Walter nearly two years ago and had not raised a single concern about his representation until counsel, court staff, security, and 65 prospective jurors arrived at the courthouse. At some point among this adversarial drama, the show must go on. Especially when the defendant appears to view the resulting delay as a feature, not a bug. Lacking any good cause to grant the motion to withdraw, the Court denied the implicit request for a continuance to

find a new lawyer.  The first part of the opinion below clarifies the reasons why—originally announced from the bench so jury selection could proceed.

But the trial did not, in fact, proceed.  Jackson quickly decided to forgo his jury trial and change his plea instead.  Before allowing him to do so, the Court extensively questioned Jackson to ensure that he knowingly, intelligently, and voluntarily entered the agreement.  Then, two months later, Jackson moved to withdraw his plea.  The second part of the opinion below explains why the law doesn't allow him to do so.  He's provided no "fair and just reason" that undermines his earlier decision to admit his guilt and surrender his trial rights.  So the Court denies his motion and reschedules his sentencing hearing for September 22, 2026.

## I.  THIS LITIGATION

### A.  Jackson's Representation During Pre-Trial Proceedings

Soon after a grand jury indicted Jackson on four counts of methamphetamine-trafficking charges, he retained Richard Walter, who represented him at his initial appearance and arraignment in December 2024.  *See* Order Following Appearance and Arraignment (DN 19).  During the ensuing 16 months, defense counsel attended several status conferences and filed a motion to transfer detention facilities (DN 27), a motion to remand to state custody (DN 33), and three motions to suppress (DNs 34, 51, & 52).

The suppression motions sought to exclude any evidence obtained from the Government's use of a vehicle-tracker warrant.  To address these pending motions, the Court held a suppression hearing, in which defense counsel cross-examined the Government's case agent, David Clark.  *See* Suppression Hearing Tr. (DN 58) at 20–38.  Following that hearing, defense counsel submitted a supplemental response, moving for the suppression of "all evidence" from an April 16 arrest of Jackson.  Motion (DN 64) at 1.  The Court denied those suppression motions in an 11-page written opinion, explaining that probable cause supported each of the warrants that authorized the tracking devices and subsequent searches.  Opinion and Order (DN 84).

Preparation continued for a December 2025 trial.  Defense counsel submitted a trial memorandum and received the Government's exhibit and witness lists.  But on the morning of trial, an untimely illness thwarted defense counsel's ability to attend court.  He was at least able to appear on the record via speakerphone, with everyone else in the courtroom, to explain his predicament.  During that hearing, Jackson (who was present in the courtroom) waived his speedy-trial rights so that his lawyer could continue to represent him during a later trial.  *See* DN 82.  And on that

basis the Court granted a continuance, rescheduling the trial to April 2026 with the parties' agreement.

Defense counsel continued to act on behalf of Jackson in the meantime: He filed an emergency motion for medical furlough, DN 86, and a notice of no objection to the Government's deposition motion, DN 94. A week before trial, defense counsel attended a telephonic status conference and expressed no qualms about readiness for trial or about the attorney-client relationship.

In response to an amended Government exhibit list (DN 101), filed 11 days before trial, defense counsel filed a motion in limine (DN 105) one week later. The motion sought to exclude evidence of a particular March 2024 drug shipment. It characterized this shipment as a "prior criminal act"—in other words, a forbidden form of propensity evidence—which couldn't be used to convict him for the April 2024 charged acts. *Id.* at 1. The Government responded the next day.[1]

Both parties arrived at the Court on April 20 for trial, as did a pool of 65 potential jurors.

### B. The Day of Trial

Before the jury venire arrived in the courtroom for voir dire, defense counsel made the surprise announcement that he was moving to withdraw as counsel and seeking a continuance on Jackson's behalf. Transcript of Pretrial Conference & Plea Hearing (DN 118) at 4:19–20. Asked to explain this late-breaking breakdown in the relationship, Jackson mentioned plea negotiations. To preserve their confidentiality, and at defense counsel's request, the Court paused the conference and directed Jackson and his lawyer to immediately speak with Magistrate Judge King in an *ex parte* hearing. *See United States v. Parker*, 837 F. App'x 341, 344 (6th Cir. 2020) ("A district court judge may not engage in plea negotiations."). Because the pair agreed that none of their disagreements involved privileged or otherwise confidential discussions, however, the parties returned to the District Court to resolve the motion to withdraw.

---

[1] On the day of trial, shortly after the Court denied defense counsel's motion to withdraw, the parties discussed, and the Court denied, Jackson's motion in limine (DN 105) on the record. The evidence Jackson sought to exclude was "clearly within the charged conduct" in scope and time (the methamphetamine-trafficking conspiracy alleged between March 1, and April 16, 2024), contrary to Jackson's contention. Transcript of Pretrial Conference & Plea Hearing (DN 118) at 26:10–27:17.

The Court therefore resumed the pretrial hearing—in open court, with the prosecution, but outside the presence of the waiting venire—to explore those issues.

Without disclosing any privileged conversations, defense counsel recounted the events that led to his request to withdraw. Before jury selection and trial were set to begin on Monday, April 20, he met with Jackson the three preceding days: Friday, Saturday, and Sunday, April 17–19, 2026. The meetings covered their preparation for Jackson's trial. Jackson objected that three days weren't enough. And from his perspective, the discovery he reviewed in April 2026 differed from that reviewed back in December, before the previous trial date.

The Government largely refuted that suggestion: the only new information it provided were two certified vehicle registration records from the McCracken County Clerk's Office and business-record certifications of Ring-camera footage that had already been disclosed. Hearing Tr. at 8:8–9:5. And when the Court asked whether the Government had missed any disclosure deadlines, defense counsel thought not: he did not consider any new exhibits "worth argument" because he had time to "digest [the] documents." *Id.* at 10:4–5.

During the hearing, neither Jackson nor defense counsel identified any changes in the Government's proof that would have affected their preparation. This is unsurprising given the extent to which the Government's proof had already come to light during the adjudication of Jackson's three motions to suppress. That proof had been discussed in open court, in the parties' briefs, and in the Court's written opinion. As recounted in that opinion, *see* DN 84, it consisted of:

- intercepted packages of methamphetamine addressed to the residence of Jackson's girlfriend, where he frequently stayed;
- video surveillance of Jackson arriving to the site of a controlled methamphetamine purchase;
- warrants issued authorizing the search of Jackson's person, car, and house; and
- methamphetamine and cash, seized from Jackson, which law enforcement traced to two controlled buys involving a confidential informant, Jackson, and his co-defendant Ivy Daniels, who pleaded guilty.

Defense counsel agreed that the exhibits relevant to the intercepted packages, controlled buys, and searches had been disclosed for many months. Hearing Tr. at 15:14–25.

So nothing about any changes in the Government's proof—and therefore nothing about a lack of review or preparation with that proof—warranted a change

4

in counsel.  Jackson nevertheless insisted that unexplained disagreements with defense counsel prompted him to ask for a new lawyer appointed by the Court. (Jackson retained Rick Walter on his own, but explained that his financial circumstances had deteriorated since his indictment, such that a replacement would need to be appointed by the Court based on Jackson's indigency.  Hearing Tr. at 7:4–11.)  This was apparently the first time, however, that any significant disagreement or miscommunication between Jackson and defense counsel manifested in the record. That includes the period when Jackson acceded to a delay in his trial date, notwithstanding his speedy-trial rights, after defense counsel became ill the day before jury selection in December.  And Jackson made clear that he had no desire to represent himself.  *See* Hearing Tr. at 6:23–7:12.  Consistent with the discussion on the record, and as explained more fully below, the Court denied defense counsel's motion to withdraw and continue the trial, denied his motion in limine, *see* n.1, and prepared to bring the jury venire into the courtroom.  *See id.* at 31.

### C. The Plea Hearing

Defense counsel and the Government sought time to discuss a potential resolution, which the Court allowed.  After approximately one hour, with the jury venire still waiting in the courthouse, Jackson indicated he would rather enter a guilty plea than proceed to trial with his existing lawyer.  Before beginning the change-of-plea hearing, however, Jackson (again) expressed dissatisfaction with his options: "I feel like I'm forced to take [the plea] this time." *Id.* at 32:3–4.  In response to that hesitation, the Court carefully explained that Jackson *did* have a choice to accept or decline the agreement:

> I've ruled that the trial is starting today and that you've had for two years, with the help of your retained counsel, the right to prepare for trial, the ability to view the government's evidence. And so the question now is whether we bring in the jury and start the trial or whether you go ahead with this plea agreement.
>
> Now, your lawyer told me that you had agreed to the government's offer. If you go that route, then we would have a hearing at which I made sure you understood what that entailed and the nature of the agreement and that you recognized the factual basis for a guilty plea to these four charges, okay?  That's obviously a big decision, and that's why we have that hearing and have that discussion.
>
> The alternative to that is not a delay in trial for all the reasons I've said.  The alternative is going ahead with trial, okay?

> And so what I'm going to do now is let you and your lawyer step out for a moment while the prosecutor gets things together unless you tell me right now that you've made a final decision. Would you like to talk to them for ten minutes while the prosecutor writes out the papers?

Hearing Tr. at 32:12–33:7. Jackson then reaffirmed his request to proceed with the plea hearing. *Id.* at 33:12. The Court took a short break to allow defense counsel to speak privately with Jackson. Once the parties returned, Jackson reiterated his request to change his plea. So the Court conducted a Rule 11 colloquy to ensure that Jackson knew the allegations, factual basis, and potential consequences of his charges and plea deal. Following that lengthy exchange, Jackson pleaded guilty to four counts of methamphetamine-trafficking offenses.

With the parties' agreement, the Court scheduled Jackson's sentencing date for July 10, 2026, and set the deadlines for disclosure of the presentence investigation report, any objections to that report, and sentencing memoranda. DN 112. Shortly after the probation office disclosed his PSR, Jackson filed a motion to withdraw his plea. *See* Plea Motion (DN 113). The Government then moved to extend its time to respond and to continue Jackson's sentencing hearing. *See* DN 116. The Court granted that motion and set his sentencing for August 5, 2026. *See* DN 117.

## II. MOTION TO WITHDRAW AS COUNSEL

Defense counsel's motion to withdraw followed from Jackson's preference for a new lawyer, expressed for the first time on the day of trial. Jackson did not have his own qualified and prepared replacement lined up to replace his retained counsel; if he had, the motion to withdraw surely would've been granted and the trial could've proceeded as planned with the lawyer of Jackson's choice. Instead, he demanded that the Court "appoint" him new counsel because he'd become indigent during the pendency of the case. Hearing Tr. at 7:4–3 & 32:6–11. As Jackson recognized, accommodating this request would've inevitably required the Court to again dismiss the jury pool and continue the trial a second time. And the delay necessary to find a new lawyer and get that lawyer up to speed likely would've been considerable.

Trial judges seldom allow criminal defendants to switch lawyers on the eve—much less the morning—of trial. The Supreme Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006) (citations omitted). In evaluating motions to withdraw, judges consider not just a defendant's preference but also the effect withdrawal would have on the proceeding. Reviewing such decisions for "abuse of discretion," the Sixth Circuit weighs four factors:

6

[1] the timeliness of the motion; [2] the adequacy of the court's inquiry into the defendant's complaint; ... [3] whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense[;] [and] [4] a balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.

*United States v. Marrero*, 651 F.3d 453, 464 (6th Cir. 2011); *accord United States v. Pancholi*, 148 F.4th 382, 395 (6th Cir. 2025).

Here, all four factors support the Court's denial of defense counsel's motion to withdraw.

***Timeliness.*** This motion came the morning of trial. Such "day-of" motions almost always fail. *See, e.g.*, *United States v. Jackson* [no relation], 662 F. App'x 416, 423 (6th Cir. 2016) ("[Defendant] waited until the day of trial to inform the court that he wanted substitute counsel. This Court has repeatedly upheld the finding of untimeliness in cases involving longer periods than is present here."). Indeed, by the time the Court became aware of Jackson's concerns with defense counsel, the jury pool had already arrived and was waiting to be called into the Paducah courtroom. "[W]hen the granting of the defendant's request would almost certainly necessitate a last-minute continuance, the trial judge's actions are entitled to extraordinary deference." *United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009) (quotation marks omitted). And the Sixth Circuit has deemed new-counsel motions untimely even when raised much sooner before trial. *See, e.g.*, *United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006) (one and a half months); *United States v. Williams*, 176 F.3d 301, 314 (6th Cir. 1999) (two weeks); *United States v. Trujillo*, 376 F.3d 593, 606–07 (6th Cir. 2004) (three days); *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996) (day before). So this factor plainly weighs against the motion.

The timing of this motion renders it even more suspect than usual: it came on the morning of Jackson's *second* scheduled jury selection. No mention of inadequate communication or preparation was made during the conference back in December. Then five months passed, apparently without incident, before the April trial date. Yet neither Jackson nor defense counsel raised any issues in the interim, despite other filings and a status conference. The only mention came the morning of trial in connection with the late-disclosed exhibits and updated witness list. But as discussed above, Jackson failed to explain how this late disclosure inhibited his representation or otherwise prejudiced his defense. Neither Jackson nor defense counsel ever expressly identified anyone whose appearance on the witness list unfairly surprised the defense. And defense counsel, in candor to the Court, admitted that he had more than enough time to familiarize himself with the new exhibits and updated witness

list.  *See* Hearing Tr. at 10:4–5 (defense counsel explains that he had "time to digest [the] documents," referring to the Government's supplemental disclosures).

***Adequacy of Inquiry.***  The trial judge must determine the "source" of the attorney-client conflict.  *Marrero*, 651 F.3d at 465.  That is, the judge "simply must allow a defendant the opportunity to explain the attorney-client conflict as he perceives it." *Id.*  Whether substitution is appropriate turns, in part, on the attorney's and client's views of the breakdown of the relationship or any perceived conflicts.

Here, the Court afforded Jackson that opportunity twice over—once out of the earshot of the presiding judge and prosecutor during his *ex parte* hearing with Magistrate Judge King, and again on the open record in the District Court.  As explained above and on the record, Jackson expressed concern over his and his lawyer's lack of trial preparation.  Defense counsel's failure (or inability) to share additional exhibits and potential witnesses until the weekend before trial purportedly caused Jackson to lose trust in Walter.  For the reasons discussed above, however, these evidentiary concerns were trivial, and their bearing on the broader attorney-client relationship didn't withstand scrutiny.

Jackson thus "had ample opportunity to discuss in detail his complaints regarding [his attorney] and respond to [his attorney]'s representations regarding their relationship." *Vasquez*, 560 F.3d at 467.  Defense counsel, too, offered his view of the relationship (consistent with the limitations imposed by his duty of confidentiality).  He expressed no concerns in continuing the relationship, apart from his client's general lack of "faith and trust." Hearing Tr. at 6:16–17.  He was prepared for trial—both in December (before an illness delayed those efforts) and in April—and expressed his willingness to continue his representation of Jackson.  These colloquies provided the Court with a more-than-sufficient appreciation of the relationship between Jackson and defense counsel.  And they informed the Court's determination that no good reason supported withdrawal.

***Conflict Between Attorney and Defendant.***  The ultimate question, of course, is whether the nature of the conflict between an attorney and his client is "so great that it resulted in a total lack of communication preventing an adequate defense." *Jennings*, 83 F.3d at 148 (quoting *United States v. Iles*, 906 F.2d 1122, 1130 n.8 (6th Cir. 1990)).  Here, it plainly did not.

A defendant's disagreement over trial strategy, or "differences of opinions with his attorney," generally do not amount to "a complete breakdown of communication that compromises his defense." *Marrero*, 651 F.3d at 466.  Nor does "dissatisfaction with the responses [a client] got from his lawyer" establish that sort of total lack of communication. *United States v. Saldivar-Trujillo*, 380 F.3d 274, 278 (6th Cir. 2004) (quotation omitted).

No such breakdown is apparent here. For one thing, as discussed above, counsel was prepared to take this case to trial in December. That trial was postponed, at the joint request of Jackson and defense counsel, to allow counsel's continued representation of Jackson. And nothing in the Government's disclosures before the rescheduled trial—or anything else that transpired in the intervening five months— changed strategy or preparation in any meaningful way. The Government's amended exhibit list largely corresponds with its responses to Jackson's motions to suppress and its trial memorandum: Each filing has relied on intercepted packages of methamphetamine, reports from months of physical surveillance, a cooperating source's April 14 and 16 controlled buys, and an April 16 search of Jackson's person and vehicle. Confidential conversations between defense counsel and Jackson led counsel to file three motions to suppress on Jackson's behalf, and counsel described Jackson as "one of the most intelligent people I have ever represented," reporting that Jackson had substantially aided his defense and preparation.

Jackson never said that defense counsel's strategy fell short in any way. He simply expressed frustrations with his (not his lawyer's) limited exposure to amended exhibit and witness lists, which defense counsel brought to his attention three days before the April trial. But the minor updates between the exhibit and witness list in no way thwarted the defense's ability to prepare for trial, especially considering much of the same evidence had been disclosed for over six months.

As noted, Jackson has seemed satisfied with defense counsel's representation during the long pendency of this case. Moreover, Jackson voluntarily waived his speedy-trial rights in December to permit his trial to proceed based on his preparations with defense counsel up until that point. And for months, neither had mentioned any breakdown, or lack of trust, in their relationship. To the contrary, Jackson expressed his dissatisfaction *only* with his retained counsel on the morning 65 prospective jurors arrived at the courthouse for his trial. And Jackson failed to articulate any convincing reason why his representation became inadequate on the morning of trial. So nothing supports his objection to his own retained counsel's defense, absent a compelling reason or complete breakdown in communications.

***Public Interest.*** "[T]he public's interest in the prompt and efficient administration of justice" likewise counsels denying the motion to withdraw. *United States v. Sullivan*, 431 F.3d 976, 982 (6th Cir. 2005) (quotation marks omitted). Here, "the sheer untimeliness of [Jackson's] motion … would have frustrated the prompt and efficient administration of justice in the absence of good cause to support the substitution." *Id.* And unlike cases involving appointed counsel, no one insisted that Jackson proceed through litigation and trial represented by defense counsel; that was Jackson's choice. Counsel made clear during the hearing, moreover, that no financial obstacles prevented his ongoing representation.

9

The Court also asked Jackson if he wished to proceed *pro* se, but he declined. Instead, Jackson asked the Court to appoint him new counsel as if he were indigent. Appointed counsel, however, is available only to those who are "too poor to hire a lawyer." *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963). That is apparently not the case here; certainly the Court has had no occasion to determine whether Jackson has been reduced to indigence since this case began. Moreover, the long-scheduled—and rescheduled—trial date, the presence of jurors at the courthouse, Jackson's previous decision to waive his speedy-trial rights so that defense counsel could continue to represent him, and the considerable preparations that the Government and the Court had already made for trial all suggest that the "prompt and efficient administration of justice" were best supported by proceeding with trial as planned. *See Abby v. Howe*, 742 F.3d 221, 227 (6th Cir. 2014) (longstanding trial date that had already been reset, court's late notice of problem, and experience of attorneys involved all counseled finding that efficiency was best supported by proceeding with trial).

*

Neither Walter, in moving to withdraw, nor Jackson, in seeking Court-appointed counsel based on indigency, explicitly invoked the Sixth Amendment. No one even mentioned that provision during the hearing. To the extent Jackson implicitly invoked the Sixth Amendment's guarantees, however, he was mistaken.

To start, the prudential case-management concerns discussed above animating the multifactor test for counsel substitution generally likewise measure the specific reach of Sixth Amendment protections in the context of a request for new court-appointed counsel. If a trial court "did not abuse its discretion" in denying a motion to switch lawyers, it "[t]herefore … did not violate [the defendant's] Sixth Amendment rights" either. *Marrero*, 651 F.3d at 468. As already explained, no good reason required this Court to grant an entirely elective withdrawal motion that would've demanded new appointed counsel and a concomitant delay in trial.

"The Sixth Amendment grants non-indigent defendants the right to choose their own counsel," of course, but "this right also has limits"—including "the prompt administration of justice." *Pancholi*, 148 F.4th at 395 (quotation marks omitted). And Jackson's request for a new lawyer—regardless of who paid—would've inevitably delayed the administration of justice. Nor did the motion's denial deprive Jackson of any particular lawyer; he hadn't hired one on his own, and even assuming indigency his right to counsel does not guarantee that a criminal defendant will be represented by a *particular* attorney." *Marrero*, 651 F.3d at 464 (emphasis added); *accord Iles*, 906 F.2d at 1130 ("An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel."). It's hardly clear, as explained above, that Jackson *is* indigent and

10

therefore eligible for an appointed lawyer in any event.  Last, because the Court denied Jackson's retained lawyer's motion to withdraw, there was no risk that Jackson would be forced to proceed to trial *pro se*.  Had he chosen to go ahead with trial, he would've enjoyed the "assistance of counsel"—a seasoned, hardworking lawyer who had thus far appeared to represent Jackson effectively.  No constitutional concerns, in other words, cast doubt on the Court's ruling—even had Jackson raised any.

### III.  MOTION TO WITHDRAW JACKSON'S GUILTY PLEA

### A. The Plea Hearing

Following the plea hearing and the scheduling of a sentencing hearing, Jackson (through the same lawyer) filed a motion to withdraw his plea.  His admission of guilt "was neither knowingly nor voluntarily given," he contends, because "he was afforded insufficient time to fully review and discuss the plea agreement with counsel" and "did not fully understand the nature and the consequences of the plea."  Motion to Withdraw (DN 113) at 1, 2.

Jackson is correct that a plea must be entered knowingly, voluntarily, and intelligently.  *See* FED. R. CRIM. P. 11(b).  Rule 11 "requires a judge to address a defendant about to enter a plea of guilty, to ensure that he understands the law of his crime in relation to the facts of his case, as well as his rights as a criminal defendant."  *United States v. Vonn*, 535 U.S. 55, 62 (2002).  "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."  *Brady v. United States*, 397 U.S. 742, 748 (1970).

To ensure that Jackson "understood the case proceedings; had a clear mind; was not under the influence of drugs or alcohol; and understood that he was giving up various rights by pleading guilty," the Court "performed a thorough Rule 11 colloquy."  *United States v. Hockenberry*, 730 F.3d 645, 662 (6th Cir. 2013).  During and following the plea hearing, the Court expressly made each of the relevant findings.  *See* Hearing Tr. at 38:6–8 ("the defendant [is] competent to plead guilty"), 46:10–11 ("the defendant … understands the charges and potential penalties"); 57:25–58:1 ("the defendant understands the plea agreement he's entering into and does so voluntarily"); Plea Order at 1 (similar).

Jackson confirmed that he understood the consequences of a plea agreement. The Court explained, at length, that a jury trial afforded him several rights that he would forgo if he proceeded with the plea.  *See* Hearing Tr. at 38:9–13 (right to a

11

speedy trial); 39:3–6 (right to effective counsel); 39:7–11 (presumption of innocence and the Government's burden); 39:16–18 (right to subpoena witnesses); 39:20–23 (right to testify). And the Court explicitly confirmed with Jackson his understanding of the consequences that would follow his agreement: "And, finally, do you realize that by pleading guilty you're giving up all these rights?" Hearing Tr. at 39:24–25. Jackson responded, "Yes." *Id.* at 40:1.

Jackson also confirmed his understanding of the plea agreement's terms. The prosecutor carefully explained the statutory penalties accompanying the charged conduct. Then the Court asked whether Jackson understood those terms: "Does that match the potential penalties that you understand you face today?" *Id.* at 45:4–6. He agreed. The prosecutor also described the terms of Jackson's Rule 11(c)(1)(C) plea agreement: "First, [the parties] agree that a sentence of 240 months' imprisonment is the appropriate disposition in this case. Further, the United States will argue that this sentence of imprisonment should run consecutively to any other sentence of imprisonment, and the defendant is free to argue for concurrent sentences." *Id.* at 46:24–47:4. The prosecutor later recounted the evidence it would offer, if the case went to trial, to establish a factual basis for the plea: a seized package of methamphetamine addressed to the house where Jackson's girlfriend lived and he frequently stayed; text messages between Jackson and his girlfriend discussing that package; and methamphetamine and cash—recovered during a traffic stop involving Jackson and during a search of his girlfriend's home—connected to controlled purchases involving an informant, Jackson, and Daniels. *See id.* at 58:8–59:22. Again, Jackson confirmed that he agreed this was what he was accused of and what he admitted to. *Id.* at 60:20–61:5. And he assured the trial judge that no one forced him to enter, or made promises to induce, his plea. *Id.* at 57:17–23.

Jackson, to be fair, hesitated a few times during the hearing. That reticence clearly related to his dissatisfaction with defense counsel, or rather to his dissatisfaction with the Court's ruling on the motion to withdraw. Jackson reiterated that "the trial preparation really just did it for me," and that he did not feel "fully prepared." *Id.* at 41:6–9. He also blamed his attorney for his initial confusion regarding the effect of the two charged 21 U.S.C. § 851 enhancements: "I thought they both … carry 5 years apiece." Hearing Tr. at 53:25–54:8. The Court clarified, however, that the first recidivism enhancement increased the mandatory minimum to 15 years, and the second to 25 years. *Id.* at 53:7–24. After that explanation, Jackson (again) expressed his frustration with counsel: "That's why I've been saying

I ain't been represented correctly, because I'm not understanding none of this until today." *Id.* at 54:11–13.

In response, the Court reemphasized the earlier ruling on substitute counsel and assured Jackson that he would have the ability to challenge that ruling (and presumably the adequacy of his counsel's representation) in the Court of Appeals. "You will be able to challenge my decision not to allow you to get a new lawyer this morning and raise any other claims of constitutionally ineffective assistance of counsel and misconduct, if any, by the prosecution.  But you need to file that notice, like I said, within 14 days of the judgment, okay?" *Id.* at 43:4–8.  And Jackson responded, "All right." *Id.* at 43:9.

Given these on-the-record exchanges, Jackson's belated contentions of confusion contradict his keen questions during the hearing, which revealed a clear understanding of the charges, plea agreement, trial rights, and procedural posture. Based on those in-court statements and observations, the Court is inclined to agree with defense counsel that Jackson is quite sharp. *Id.* at 21:11–13 ("Mr. Jackson is a very intelligent individual, one of the most intelligent people I have ever represented.").  Jackson consistently and credibly represented that he understood the charges against him, the Government's evidence, the consequences of the plea agreement, the potential penalties, and his appeal rights.  That he continued to reiterate his displeasure with retained counsel had little to do with his understanding of the plea agreement and decision to admit his guilt rather than proceed to trial.

### B. The Motion

The motion to withdraw the plea tells a very different story.  Although Jackson "understands there is no absolute right to withdraw a plea," he contends that the "law … favor[s]" doing so here.  Motion to Withdraw Plea at 3.  His request hinges on Federal Rule 11(d)(2)(B), which permits withdrawal "after the court accepts the plea, but before it imposes sentence," if the defendant "can show a fair and just reason for requesting the withdrawal."  This "allow[s] a hastily entered plea made with unsure heart and confused mind to be undone," but it does "not … allow a defendant to make a tactical decision … if he believes that he made a bad choice in pleading guilty." *United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991) (quotation marks omitted).  To draw that distinction, the Sixth Circuit has articulated several factors relevant to the trial judge's decision:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure

to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

*United States v. Catchings*, 708 F.3d 710, 717–18 (6th Cir. 2013) (quoting *United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994)). These factors, however, "are a general, non-exclusive list and no one factor is controlling." *United States v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir. 1996).

Jackson contends that these factors favor him overwhelmingly: "it is patently clear that defendant Jackson has shown a fair and just reason for his withdrawal of his guilty plea under Rule 11." Motion to Withdraw Plea at 4. But Jackson hasn't made that showing by a long shot. His motion closely resembles the sort of "tactical decision" the law frowns on, and looks little like a "hastily entered plea made with unsure heart and confused mind." *Alexander*, 948 F.2d at 1004. And the *Bashara* factors overwhelmingly cut against his request.

**1. Time between the plea and the motion.** Jackson filed this motion two months after pleading guilty, and only two weeks before his scheduled sentencing hearing.[2] Although the Sixth Circuit has not "fashioned a precise cut-off point beyond which delay is unreasonable," *United States v. Carson*, 32 F.4th 615, 624 (6th Cir. 2022) (quotation marks omitted), it has "considered delays of 35 or 42 days to cut against plea withdrawal," *United States v. Davis*, 2023 WL 2487338, at *3 (6th Cir. Mar. 14, 2023). Generally, delays exceeding a month or two cut against withdrawal. *See, e.g., United States v. Valdez*, 362 F.3d 903, 913 (6th Cir. 2004) (75 days); *United States v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996) (67 days); *United States v. Spencer*, 836 F.2d 236, 239 (6th Cir. 1987) (35 days). And Jackson's motion cites no authority to the contrary. So his 65-day delay cuts against his request.

**2. Reasons for the delay between the plea and motion.** Jackson's motion neither acknowledges the length of delay nor provides reasons for it. Instead, it

---

[2] After Jackson filed this motion, the Government moved for additional time to file its response, which necessitated continuing the sentencing hearing pending this Court's ruling. *See* DN 116. The Court granted those requests and converted the August 5, 2026, sentencing hearing to an in-person hearing that same day. *See* DN 117.

14

includes a vague statement that "[s]hortly after the plea was entered, the defendant requested that a motion be made on his behalf to withdraw the plea." Motion to Withdraw Plea at 3. If the implication is that the bulk of the delay is attributable to counsel rather than client, then that assertion is neither explicit nor supported. Because the motion ultimately appeared *two months* after his plea, not "[s]hortly after." *Id.* And it appeared without any reason for the delay, despite the Sixth Circuit having "emphasized the importance of the justification for a delay in moving to withdraw a plea, explaining" that "a defendant's reasons for filing such a motion will be more closely scrutinized when he has delayed his motion for a substantial length of time." *Baez*, 87 F.3d at 808 (quoting *United States v. Triplett*, 828 F.2d 1195 (6th Cir. 1987)). Without any reason at all for delay, this factor provides no support for Jackson's motion.

**3. Whether Jackson has asserted his innocence.** Jackson's motion never mentions a claim of innocence as a "fair and just" reason for withdrawal. And during the April 20 colloquy, innocence played no part in defense counsel's request to withdraw from the case or Jackson's choice to proceed with the plea deal rather than a jury trial. After the Government described the evidence it would produce against Jackson should he proceed to trial, Jackson confirmed that he understood its case and agreed with the Government's description of his conduct. Hearing Tr. at 59:23–60:3. He expressly agreed that he distributed methamphetamine on April 14, 2022, and April 16, 2022. *Id.* at 60:24–61:2. And he agreed that he possessed methamphetamine with the intent to distribute it. *Id.* at 61:3–5. To eliminate all doubt, the Court asked, "is the reason you're pleading guilty to these offenses because you did, in fact, commit those four offenses?" Jackson responded: "Yes." *Id.* at 61:11–14.

Initially, Jackson expressed disagreement with the conspiracy charge: "I ain't conspire with Daniels to do nothing or nobody else." *Id.* at 60:9–10. But his tune changed once the Court, and his attorney, explained the meaning of "conspire" as it related to the charge against him. *Id.* at 60:20–23 (agreeing that he conspired to possess the drugs with the intent to distribute them). Otherwise Jackson expressed little hesitation:

> THE COURT: And now, Mr. Jackson, could you please tell the Court how you plead with respect to Count 1 of the superseding indictment against you?
>
> JACKSON: Guilty.

THE COURT: And Count 2?

JACKSON: Guilty.

THE COURT: And Counts 3 and 4?

JACKSON: Guilty.

*Id.* at 61:17–24.  No statement on the record, in any pretrial motions, during the pretrial conferences and hearings, or on April 20, advanced a theory of innocence.  His plea colloquy plainly stated the opposite.  So this factor cuts against his request.  *See Catchings*, 708 F.3d at 718 ("The third factor also weighs against Catchings because he pleaded guilty, affirming that he was, in fact, guilty, and has not asserted that he is innocent.").

**4.  Circumstances underlying the guilty plea.**  Jackson contends that the April 20 hearing presented him with two choices: "g[o] to trial with an attorney he was attempting to discharge" or "enter a plea" despite his "very limited time to review and understand the agreement."  Motion to Withdraw Plea at 4.  Because he had "less than 45 minutes to read, digest, and complete his analysis of the plea agreement," he "did not fully understand the nature and consequences of the plea at the time it was entered."  *Id.* at 2.

Jackson's belated misunderstanding contradicts his statements on the record, as recounted carefully during the hearing and again above.  Throughout the change-of-plea hearing, Jackson said he understood the factual basis for the plea, potential sentences, and foregone trial rights.  He confirmed that he understood and that he had time to consult with his attorney.  Hearing Tr. at 61:11–16 (factual basis for plea); 39:24–40:1 (waiver of rights); 45:1–7 (penalties and charges).  His later disavowals draw a skeptical audience here and in "the Sixth Circuit," which "has voiced skepticism against belated claims regarding misunderstandings of the plea agreement."  *United States v. Crowe*, 2022 WL 6202056, at *3 (W.D. Ky. Oct. 7, 2022) (citing *Ramos v. Rogers*, 170 F.3d 560, 566 (6th Cir. 1999)).  And for good reason.  This is why courts transcribe plea hearings.  "If we were to rely on [the defendant]'s alleged subjective impression rather than the record, we would be rendering the plea colloquy process meaningless, for any convict who alleges that he believed the plea bargain was different from that outlined in the record could withdraw his plea, despite his own statements during the plea colloquy (which he now argues were untruthful) indicating the opposite."  *Ramos*, 170 F.3d at 566.

16

Jackson implies that he was coerced into taking the deal.  But this was no Hobson's choice.  Jackson had "two years, with the help of [his] retained counsel," to "prepare for trial" and "view the government's evidence."  Hearing Tr. at 32:12–17.  He had the option to exercise his Sixth Amendment right to a jury trial.  And he relinquished that right in order to plead guilty under a Rule 11(c)(1)(C) agreement that called for a 20-year sentence (based on the dismissal of one charged sentencing enhancement).  *See* DN 108.  His counsel never refused to represent him during the trial, which he had prepared (twice) to do.  Jackson's right to either plead guilty or force the Government to prove its case at trial had been clear for years.  And that option remained clear on April 20, despite the Court's rejection of his counsel's motion.  Instead, Jackson agreed to the plea deal.

**5.  Jackson's nature and background.**  Jackson, again, offers no argument regarding why his nature or background would favor withdrawal.  And no reason is apparent.  Although he lacks a GED, he attended high school until his junior year.  PSR (DN 111) ¶ 90.  He advised the Probation Officer that he previously owned a "commercial cleaning business."  ¶ 94.  And his retained attorney attested to his intelligence: "Mr. Jackson is a very intelligent individual, one of the most intelligent people I have ever represented."  Hearing Tr. at 21:11–13.  Again, this factor cuts against his request.

**6.  Prior experiences with the criminal-justice system.**  Jackson is no stranger to the criminal-justice system.  His prior convictions prompted the Government's two notices under 21 U.S.C. § 851: within 15 years of the charged conduct, he had been convicted of several felony offenses in McCracken (County) Circuit Court.  *See* Superseding Indictment at 3 (providing notice of September 2007, February 2013, and November 2016 felony offenses).  And his PSR lists many misdemeanors: possession of marijuana, ¶¶ 51, 58, 63, 64 & 65; assault of a government officer, ¶ 52; possession of drug paraphernalia, ¶ 55; and operation of a vehicle under the influence of a substance, ¶¶ 56, 61.  With this rap sheet, the Sentencing Guidelines consider him a career offender with a criminal-history category VI.  ¶ 69.  So this factor, too, cuts against Jackson.  *See Catchings*, 708 F.3d at 719 ("[T]he sixth factor weighs against Catchings because he has fairly extensive prior experience with the criminal-justice system, as reflected in his criminal history category of III.").

**7.  Potential prejudice to the Government.**  Jackson contends that a plea withdrawal would not cause the Government to "suffer substantial prejudice."  Plea Motion at 5.  "[I]t is not necessary for the Court to consider prejudice to the

17

Government," however, if (like here) "the defendant is unable to establish fair and just reasons." *Hockenberry*, 730 F.3d at 662. Regardless, this factor favors the Government, which clearly could "possibly suffer prejudice" were the motion granted. Response (DN 124) at 4. The "case is relatively complex and requires approximately 25 witnesses," many of whom "live out of state or many hours away," so "it's quite possible that one or more … may not be available for trial." *Id.* A new trial would mark the third that the Government and its witnesses would have to prepare for. Given the inevitability of fading memories and the expense of trial preparation, granting the motion would cause at least some inconvenience to and interference with the Government's case. *See United States v. Martin*, 668 F.3d 787, 797 (6th Cir. 2012) ("[T]he amount of time and effort it would take to restart a trial and the effect of delay on individuals' memories would be prejudicial.").

## C. State Prosecution

Jackson offers a final reason, unrelated to the *Bashara* factors, to support his withdrawal motion: "During the preparation for trial it was discovered that the Assistant Commonwealth Attorney in Graves County, John Beasley, was suffering from [a] significant alcohol use problem." Motion to Withdraw Plea at 6. So "[t]he plea agreement should be withdrawn so more time can be used to investigate fully Attorney Beasley's failures." *Id.*

But Jackson hasn't drawn any connection between a state prosecutor's (alleged) discovery failures and the federal prosecution of federal charges in federal court. Normally the prosecutions are distinct: a state's disposition of state crimes has no bearing on the United States' disposition of a federal crime. *See United States v. Louisville Edible Oil Products, Inc.*, 926 F.2d 584, 587 (6th Cir. 1991) ("[A]n act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each.") (quoting *United States v. Lanza,* 260 U.S. 377, 382 (1922)). And to the extent Jackson indicates that Beasley was involved in the investigation that led to these federal charges, he hasn't even suggested how the state prosecutor's actions or struggles affected this litigation.

18

## ORDER

For these reasons and those discussed during the hearing, the Court denied defense counsel's motion to withdraw from the case and denies Jackson's motion to withdraw his guilty plea.